UNITED STATES of America, Plaintiff,

v.

William Francis VAN NUYS, Defendant.

Crim. A. No. 85–CR–304.

United States District Court, D. Colorado.

Jan. 10, 1989.

See also, 650 F.Supp. 525.

Joseph Mackey, Asst. U.S. Atty., Denver, Colo., for plaintiff.

Richard G. Sherman, Los Angeles, Cal., Rowe P. Stayton, Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

The jury in this case found the defendant not guilty of Count Three of the Indictment which charged the defendant with a Continuing Criminal Enterprise in violation of 21 U.S.C. § 848. More particularly, the jury was given special interrogatories and answered "no" to the question of whether the government proved beyond a reasonable doubt that William Van Nuys was a knowing and willful participant in three or more of the drug offenses alleged in subparagraphs (a) through (1) in Paragraph 2 of Count Three. Those were allegations of importation and distribution of cocaine at particular times and in particular amounts. After more than four days of deliberation, the jury reported that they were unable to agree on the five other counts submitted to them and, accordingly, a mistrial was declared. Now before the court is the defendant's motion for dismissal and a renewal of the motion for judgment of acquittal made at the conclusion of the government's case.

Those five counts are conspiracy charges. Count Five alleges a conspiracy in violation of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c)—to conduct the affairs of an enterprise through a pattern of racketeering activity. The first three paragraphs of Count Five alleged the "enterprise" in the following language:

1. During the years from approximately 1975 until 1978, defendants WILLIAM COMPTON MUSSON and GARY ERWIN MINTZ and unindicted coconspirator John Kister Zell were a group of

individuals associated in fact although not a legal entity.

2. In or about 1978, the association of defendants WILLIAM COMPTON MUSSON and GARY ERWIN MINTZ and unindicted coconspirator John Kister Zell still existed and was joined by defendant WILLIAM FRANCIS VAN NUYS and thereafter this association of individuals invested in Coast Finance, a corporation established pursuant to the laws of the State of California.

3. From approximately the year 1975 until the present, the aforesaid association of individuals and Coast Finance constituted an "enterprise" as defined by Title 18, United States Code, Section 1961(4).

Of the twelve racketeering acts alleged, racketeering acts 7 through 12 repeat the same importations and distributions that are alleged in subparagraphs (a) through (1) in Count Three. Additionally, Count Five incorporated by reference 158 overt acts alleged in Count Four, a RICO conspiracy charge which was dismissed before trial for the failure to allege the interstate commerce element of the offense.

Count Six alleged a conspiracy to import cocaine and again incorporated the same 158 overt acts from Count Four. Count Seven alleged a conspiracy to possess cocaine with intent to distribute it, incorporating the same overt acts. Count Ten charged a conspiracy to travel in or use facilities in interstate or foreign commerce to distribute proceeds of an unlawful activity, incorporating the same overt acts, and Count Eleven alleged a conspiracy to travel in or use facilities in interstate commerce in aid of a racketeering enterprise, also incorporating the same overt acts. Counts Six and Seven were incorporated by reference as other offenses in the continuing criminal enterprise alleged in Count Three. Each of these conspiracies is alleged to have begun at a date unknown to the grand jury and to have continued to approximately January 1, 1984. Each of them alleges the conspirators as William Compton Musson, Gary Erwin Mintz, William Francis Van Nuys, and unindicted coconspirator John Kister Zell.

Before trial, this court denied the defendant's pre-trial motions that some counts should be merged and that these conspiracy counts were multiplicitous. The court's ruling was that, as alleged, the conspiracies were different because they had different objectives. After considering all of the evidence in the case and the manner of presentation by the prosecution, the court now finds and concludes that this combination of charges generated such confusion that the defendant was denied a fair trial and that the indictment should be dismissed because re-trial would violate the defendant's constitutional right to be protected from double jeopardy.

The government did not present any consistent theory of the defendant's guilt and used alternative approaches to greatly expand the scope of admissible evidence. In his opening statement, the prosecutor described the development of an organization for the importation and distribution of cocaine, beginning with trips made in December, 1975, continuing into 1976 when John Zell joined. Modified suitcases holding cocaine were brought into the United States by couriers. In 1977, aircraft were used and the government asserted that the defendant Van Nuys became involved in 1978 and thereafter laundered the proceeds from drug sales through Coast Finance Company. It was represented that the evidence would show that the co-defendant William Musson was in charge of distribution for this organization, John Zell was responsible for the smuggling operations, that Gary Mintz obtained investors to finance the operations and that William Van Nuys managed the money. The picture portrayed by the prosecutor in the opening statement was that of a continuing criminal enterprise which operated continuously from 1975 to January, 1984, with persons moving in and out of the organization's activities.

On the second day of trial, government counsel indicated that he was ready to offer testimony about conversations "involving the conspiracy." When the court inquired as to which conspiracy, Assistant United States Attorney Mackey responded: "Well, I think this probably will cover all of

**468**

those eight conspiracies." (Tr. 2-2—2-3). The court reserved ruling on the admissibility of statements under Rule 801(d)(2)(E) throughout the trial, trusting that the prosecution would ultimately be able to meet the requirements of the rule by proving the continuity of the conspiratorial conduct from the ealiest to the latest transactions, making the defendant liable as a late joiner in the unlawful combination. Accordingly, such testimony was conditionally received and then finally admitted by the court's ruling before submission to the jury. Viewed retrospectively, that approach was unfortunate, although, it is difficult to see how the court could have proceeded with a *James* hearing before trial as recommended in *United States v. Petersen,* 611 F.2d 1313, 1330–31 (10th Cir.1979), or by mini-*James* hearings during the course of the trial.

The evidence in this case took more than three weeks to present and there were numerous difficulties involving the prosecution's duties under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and 18 U.S.C. § 3500. The only conspirators named in the various counts of the indictment were the three named defendants, William Compton Musson, Gary Irwin Mintz and William Francis Van Nuys, and an unindicted co-conspirator John Kister Zell. Many other persons testified to participating in importation, distribution and investing in cocaine transactions during a ten year period. If this court were the trier of fact in this case, it would find that the existence of the continuing criminal enterprise with management roles of the named defendants for the time alleged in the indictment had not been proven. There is no evidence that Van Nuys had any participation before 1978. Zell last participated in the smuggling activities after a successful airplane flight in June, 1978. Mintz had no operational activities after 1979 and the smuggling efforts in 1982 were quite different from the earlier operations in methodology and participants.

■ The evidence did establish many episodes of importing and distributing cocaine conducted by differing combinations of persons, using various methods and with differing results. There can be a continuing conspiracy with participants leaving and joining at different times, and there can be parallel conspiracies existing contemporaneously with different objectives. To apply the evidentiary requirements of Rule 801(d)(2)(E) the court must find, by a preponderance of the evidence, that statements offered in evidence were made while the conspiracy existed, by co-conspirators with Van Nuys at a time when he was a participant and in furtherance of the conspiracy charged. While conduct of co-conspirators is admissible under different standards, Rule 403 limits the admissibility of relevant evidence when its value is outweighed by unfair prejudice and confusion of the issues. Having now considered all of the evidence in the case, this court concludes that much of it should have been excluded and that the failure of defendant's counsel to make timely objections under Rule 403 is excused because of the confusion generated by the prosecution's approach to the case.

■ The government's first witness, John Zell, described his smuggling activities beginning in 1976. Zell told of several trips made to import cocaine before he had met or heard of Van Nuys. Each of those trips was discussed in detail, including the method of transporting the cocaine into the United States. Zell's last smuggling trip was in 1979. The government's last fact witness, William Musson, discussed numerous trips as well, including a trip in the spring of 1981, and the efforts at planning that trip. All of these trips were included among the 158 overt acts alleged in Count Four and referenced in each conspiracy count. It is apparent from the manner in which the defendant was charged and the evidence presented that the prosecution attorney was putting "the organization" on trial. Indeed, the record is replete with references to "the organization," and it is clear that the prosecuting attorney had a monolithic view of that organization. But the evidence did not support that view.

The cocaine importations described by the witnesses up through 1979 were vastly

different in character from the 1981 importation of cocaine paste recounted in the testimony of Fred Beahm, Robert Musson and Amparo Uribe–Vega. Neither William Musson nor Gary Mintz played any management role at that time. The testimony connecting the defendant Van Nuys to the 1981 activities is principally that of Robert Musson. He was not involved in the earlier transactions, described principally by John Zell and Gary Mintz. Those witnesses were emphatic in their testimony that they purposefully did not disclose to William Van Nuys the source of the proceeds being invested by them with him. There is therefore a wide gap, amounting to a chasm, in the relevance of the testimony concerning all of these prior acts to the complicity of William Van Nuys. The only theory for making the connection is the continuing single conspiracy with late joinder by this defendant, and it was on the assumption that the evidence would support that concept of concerted action that this court permitted this case to go to the jury. Upon reflection, this court now finds that the government failed to prove by a preponderance of the evidence that any single continuing conspiracy existed and, accordingly, the evidence of all of the transactions prior to 1978 should not have been received. The government cannot now be given a second opportunity to reform its charges and again subject this defendant to another trial using a separate conspiracy approach. To do so would, itself, result in a fatal variance from the charges which include the entire 158 overt acts incorporated by reference into each count. The government charged a single conspiracy and multiple conspiracies in the same indictment for the same period of time with the same co-conspirators and thereby created the chaos which was this trial.

The nine years of continuous conspiratorial conduct alleged in this case is inconsistent with the government's approach in other prosecutions based on the same investigation. Fred Beahm was prosecuted for two separate conspiracies, one in the Central District of California and one in the Southern District of Ohio, based upon some of the acts described in the 158 overt acts

in the indictment in this case. Amparo Uribe–Vega and Robert Musson were also prosecuted with Beahm in Ohio on a separate conspiracy charge based on only some of these acts. Only in Colorado did the government make the effort to link all of these incidents and transactions together and describe in 158 overt acts in 15 pages of the indictment what is referred to as "a factual chronology of the organization's beginning and development and a history of the cocaine importation and distribution episodes ..." Government's Response, p. 6. While the prosecution again proved the same conspiracies as those charged in Ohio and California, together with other conspiracies to import and distribute other loads, it failed to connect them together and bring them under one canopy of continuing criminal conduct.

The government apparently concedes in its response that this trial lacked sufficient focus to be comprehensible by a jury. It is said that if this case goes to trial again, the government intends to try a simplified case and will dismiss Counts Ten and Eleven of the indictment, thereby attempting to eliminate a multiplicity claim. Thus, a new trial would be a RICO conspiracy, an importation conspiracy and a possession with intent to distribute conspiracy. That approach overlooks the fact that there are multiple episodes at different times within those counts. The government has had the opportunity to prove its conspiracy counts and failed to produce sufficient evidence to link the defendant to the earlier episodes.

The difficulties inherent in the trial of any conspiracy charge are compounded by the actions of Congress in criminalizing the same conduct through an array of statutory prohibitions with only small variations in the essential elements of the offenses. Prosecutors are free to select from this statutory smorgasbord in joining offenses and the appellate courts have been very accommodating in remedying the overreaching by limiting sentences. That remedy, however, does not address the difficulties confronting defendant's counsel and the court in analyzing the evidence and this case demonstrates that the prosecutor can,

himself, be thrown into confusion in his attempts to marshal the evidence to meet the multiple charges.

In the government's response to the post-trial motions, government's counsel sets forth a chronology of the investigation leading to the subject charges. That account is informative and is some explanation for much of what defendant's counsel characterizes as prosecutorial misconduct. Government lawyers in four different judicial districts and three different investigative agencies were involved in investigating and prosecuting cases arising out of the same drug transactions.

█ The two principal witnesses tying the defendant Van Nuys to the importation and distribution of drugs were William Musson and his brother Robert Musson. Their testimony differed from that of other witnesses who dealt with Coast Finance and Van Nuys concerning Van Nuys' knowledge of the source of funds deposited in Coast Finance. Their credibility was of critical importance. William Musson did not testify before any grand juries. At the time of trial he was in custody serving a sentence on the conviction by his pleas of guilty under a negotiated plea agreement. The government brought him to Colorado before the trial and interviewed him extensively through AUSA Mackey, DEA Agent Canty, IRS Agent Wright and DEA Agents Guinn and Martinez. No reports of these extensive interviews were made and none of them was recorded. Mr. Mackey had instructed all of the agents that reports were to be written only if any new, different, inconsistent or exculpatory statements regarding Van Nuys were made by William Musson. Some nine hours were consumed in these interviews according to the trial testimony of William Musson. In the government's brief, Mr. Mackey concedes that the agent meetings appeared to be excessive and represented that such procedure will not be followed in the future. Mr. Mackey denied any sinister purpose.

The failure to write reports of interviews of this material witness was contrary to the established procedures for the FBI and the DEA. William Compton Musson was the government's principal witness and he was called as the last fact witness in an obvious effort to dramatize and emphasize his testimony. The interviews with four agents and the prosecutor shortly before this trial appearance and the purposeful avoidance of recording or reporting the statements made by this witness resulted in a deliberate denial of any opportunity to attack his credibility through inconsistencies between his trial testimony and what he said in those interviews. The events and transactions which were the subject of William Musson's testimony went back ten years. Obviously, his ability to recall and recount was affected by each repetition. The opportunity for cross-examination by comparing statements should not be foreclosed or limited by the procedure followed here, where it was entirely left to the government agents to decide whether what he said was new or different from his prior interviews. It is contrary to ordinary human experience to believe that in nine hours of review of matters as detailed and complex as reflected in the 409 pages of the transcript of his testimony at this trial, this witness would not have said something new or different from his prior statements. Moreover, in the government's response to the defendant's motions, AUSA Mackey advised this court that he reviewed with William Musson his "daily planners" which outlined the cocaine conspiracy from 1977 through 1982 and that the statements given by Musson during the interviews "concurred with what had been written in the reports and what was outlined in his daily planners." Government's brief, p. 21.

It must be remembered that William Musson sought to gain from his testimony at this trial, expecting assistance from the prosecution for favorable parole consideration as a result of his cooperation. Moreover, this witness exhibited hostility and personal antagonism toward the defendant Van Nuys as was clearly demonstrated during his cross-examination. The jury was instructed in this case to view the testimony of William Musson and like witnesses with great caution and to weigh it with great care. The prosecutor and the government agents had a similar responsi-

bility and it is the duty of a prosecutor, himself, to evaluate the credibility of the witnesses he calls to the stand. Indeed, an obvious purpose of the standard procedure for the FBI to write 302 reports and the DEA to prepare and keep DEA 6 reports is to have some assurance about the credibility of the information they receive in their investigations. Whatever Mr. Mackey's motivation may have been, the court's conclusion is that his instruction to conduct these interviews without reports constitutes a violation of the obligation to preserve evidence and is, in itself, a basis for a finding that the trial of William Van Nuys was fundamentally flawed. No new trial could remedy this flaw because whatever William Musson said during those nine hours of interviews has been irretrievably lost.

■ Robert Musson was convicted in Cincinnati, Ohio through a plea agreement in which he agreed to be thoroughly debriefed by government agents and he was interviewed by both a DEA and an IRS agent. He was also a witness at the Cincinnati trial of Amparo Uribe–Vega, who was defended by Richard Sherman, counsel for William Van Nuys in this case. Mr. Sherman, as defense counsel in this case, had a comprehensive report from the IRS agent concerning the debriefing of Robert Musson and the transcript of his trial testimony in Cincinnati. Robert Musson was also interviewed by DEA agents Franklin Smith and William Guinn in San Diego, California. No DEA 6 interview report was written by Franklin Smith covering this debriefing, and agent Smith's notes of the Robert Musson interview were said to be contained in documentation sent to Denver, but never located. AUSA Mackey provided his own notes, made while he was present at agent Smith's interviews and went over them with Mr. Stayton, co-counsel for Mr. Van Nuys.

The failure to produce the notes written by Franklin Smith concerning the debriefing of Robert Musson denied defense counsel an opportunity for fair cross-examination. It was made clear in the cross-examination of this witness that his testimony at this trial differed from that given at the trial of Amparo Uribe–Vega in that the prior testimony did not include the defendant's comments that the funds provided were insufficient to purchase the amount of cocaine originally intended and that a smaller quantity would therefore be obtained. While the loss of documents in a complex investigation may be understandable, the prejudicial effect on the defendant's ability to challenge the credibility of the witness is a consequence which must be considered within the constitutional limitations of fairness inherent in the due process clause. Viewed in the context of the totality of the evidence, it is this court's view that the testimony of Robert Musson and of William Musson was so important to the government's case and that these lost opportunities to challenge that testimony were of such material importance to the defense that an unfair trial resulted. All of the other witnesses testifying to contacts with William Van Nuys, including Gary Mintz, said that they purposefully did not advise William Van Nuys of the source of the funds being deposited in or being processed through Coast Finance. In the absence of the testimony of the brothers Musson, this court might well have directed a verdict of acquittal or the jury might have acquitted on the conspiracy counts as they did on Count Three.

There are a number of other matters which the defendant has asserted constitute prosecutorial misconduct warranting the sanction of dismissal. Included was the failure of the prosecutor to give defendant's counsel transcripts of testimony of Fred Beahm and Dan Sharp before a federal grand jury in Los Angeles, California. When Dan Sharp was called as a trial witness it was discovered that he had given grand jury testimony concerning Van Nuys, contrary to the representation made by AUSA Mackey when that question had been raised by defendant's counsel. The cross-examination of Mr. Sharp was delayed until a transcript of that testimony was provided. The California grand jury testimony of Fred Beahm was not delivered to defense counsel until shortly before Mr. Beahm's call to the stand in this case. Ad-

ditionally, grand jury testimony given in Colorado by witness Mary Kady was not provided until it was requested specifically by defense counsel and the explanation given was that it had been misplaced in the U.S. Attorney's office. Mary Kady never appeared as a witness in this case. While defense counsel attributes sinister motives to Mr. Mackey in these matters, the court concludes that the better explanation is the confusion involved in the preparation of the case given the scope and complexity of the investigation.

An additional concern was raised by a pre-trial motion, filed December 16, 1987, asserting that the government had failed to produce or disclose a number of documents taken during the searches of the offices of Coast Finance Company pursuant to search warrants issued in 1982 and 1985. A declaration of Mitch Geller has been filed in support of the defendant's post-trial assertion that these missing documents were exculpatory, particularly in showing legitimate loan activities of Coast Finance. The government's brief does not address this problem. In response to the defense contention that the government did not comply with this court's pre-trial directives to identify and provide copies of trial exhibits, Mr. Mackey advised that defendant's counsel and paralegals were invited to the U.S. Attorney's office to review all of the documents since the government's position was that the documentary evidence would be viewed in a vacuum if the list provided to the defense only outlined those items which would be presented at the trial, because not all of the evidence that had been taken through the subpoena process or through search warrants would be offered as exhibits. It is not known to this court what condition the files and records of Coast Finance Company were in at the time of their seizure. It is known that throughout the trial there was difficulty locating documents contained in many boxes which were in the courtroom and corridor. This is another problem resulting from the government's non-selective approach in producing a massive amount of evidence without identifying its relationship to the particular counts in the indictment.

The defendant has also contended that pre-indictment delay prejudiced the defense at trial. Coast Finance records were first seized in 1982. The indictment was not returned until 1985 and trial did not take place until January, 1988. The post-indictment delays were caused principally by the necessity to consider many motions and by the need for adequate pre-trial procedures to try the case with some efficiency.

## CONCLUSION

Taken as a whole, the problems attendant upon the prosecution of William Van Nuys under this indictment constitute a denial of due process of law. The case is comparable to *United States v. Glist*, 594 F.2d 1374 (10th Cir.1979). While the focus of that case was on prejudice resulting from pre-indictment delay, the inquiry was whether a fair trial was possible. In this case, the trial was fundamentally flawed and unfair. It is noteworthy that the jury found the defendant not guilty on the continuing criminal enterprise charge, Count Three of the indictment, where the verdict form required them to focus on the particular acts of importation and distribution set out specifically in subparagraphs (a) through (l) of that count. The other questions contained in the special verdict form asked only if the conspiracies had been proven, if the defendant had been shown to be a member of the conspiracy and an overt act proved. The obvious difference is that the conspiracies charged in the other counts were incapable of definition because each of them involved all of the 158 overt acts in Count Four and, accordingly, included multiple conspiracies. These are amorphous allegations which simply were not and could not be presented meaningfully.

The defendant should not again be subjected to trial on these charges. This was a case in which the mistrial by lack of verdict can be attributed to the fault of the government in the manner in which the case was charged and the evidence presented. A retrial on any of the charges in this indictment would violate the constitutional protection against double jeopardy under

these circumstances. Accordingly, it is now

ORDERED that the indictment is dismissed, the defendant discharged and the restraining order of November 6, 1985, is vacated.