# United States Court of Appeals
## For the First Circuit

---

No. 00-2416

UNITED STATES OF AMERICA,

Appellee,

v.

JOSEPH BRADSHAW,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

---

Before

Selya, Circuit Judge,

Campbell, Senior Circuit Judge,

and Lynch, Circuit Judge.

---

Juliane Balliro, with whom Perkins, Smith & Cohen, LLP was
on brief, for appellant.
Sangita K. Rao, Attorney, U.S. Dep't of Justice, with whom
Michael J. Sullivan, United States Attorney, was on brief, for
appellee.

---

February 25, 2002

---

**SELYA, <u>Circuit Judge</u>.** The poetess Nikki Giovanni once commented that: "Mistakes are a fact of life. It is the response to the error that counts." Elaine Partnow, <u>The Quotable Woman: 1800-1981</u> 453 (1983). Defendant-appellant Joseph Bradshaw, a recidivist robber, would have done well to heed the message inherent in these words of wisdom. The tale follows.

In the court below, the government charged that the appellant repeated and compounded the error of his ways. A jury agreed, convicting him on an array of charges, including armed robbery and attempted murder. Invoking the "Three Strikes Law," 18 U.S.C. § 3559(c), the district court sentenced the appellant to life imprisonment. In this appeal, Bradshaw — vigorously represented by able counsel — raises a substantial claim of jury taint. He also challenges various evidentiary rulings and the constitutionality of the Three Strikes Law. Although the government has offered us surprisingly little help, our perscrutation of the record and the case law persuades us that the conviction and sentence must stand.

## I.   BACKGROUND

We recount the relevant facts as the jury might have found them, consistent with record support. In that exercise,

we paint with a broad brush, reserving more extensive detail for our ensuing discussion of the appellant's specific claims.

The charges against the appellant stem from separate, but related, incidents. Our chronological narrative begins in the spring of 1995, at which time the appellant's circle of friends included Thomas Sutherland and the DeSimone brothers, Ronald and Donald (colloquially known as "Ronny" and "Donny"). Ronny DeSimone told the appellant that, five mornings a week, a mail carrier transported large sums of money from the Lynn, Massachusetts post office to a nearby financial institution. The two men repaired to Lynn and scouted the layout of the bank. The appellant thereafter described the situation to Sutherland, telling him that Ronny DeSimone had stumbled upon "a good score." The pair decided to rob the mail carrier and reward Ronny by giving him ten percent of the take.

Sutherland and the appellant executed the robbery on June 5, 1995. When the mail carrier, Timothy Bogart, drove up to the bank, Sutherland commandeered the postal truck and ordered Bogart, at gunpoint, to drive away. After Bogart had gone a few blocks, Sutherland directed him to stop. Sutherland then snatched a mail tub containing more than $122,000 in cash and checks that had been sent by registered mail, and joined the

appellant (who was waiting nearby in a rented station wagon). The men departed in haste.

Later that same month, Sutherland and the appellant came to suspect that the DeSimone brothers were cooperating in the investigation of the robbery. They decided that Donny DeSimone had to be killed. The appellant recruited Paul Courteau to assist in this grisly business.

On July 12, 1995, Courteau and the appellant, employing a pretext, inveigled Donny DeSimone into accompanying them on a ride. The trio drove to various locations, eventually winding up at an unoccupied baseball field. There, the appellant pulled out a handgun and attempted to test-fire it. The gun jammed. Nonplussed, he herded his companions back into the car and the three men continued their meanderings.

In the early hours of the morning, they drove to a wooded area. Courteau and the appellant exited the vehicle, told Donny to stay put, and walked into the woods. A few moments later, Donny heard a gunshot. When the others returned, the appellant pointed the gun at Donny and ordered him out of the vehicle. Charging that Donny was "cooperating with the feds," the appellant forced him to his knees, handed the gun to Courteau, and instructed Courteau to shoot. Courteau pulled the

trigger, but the gun jammed once again.  Donny lost little time in fleeing from the scene.

On July 8, 1998, a federal grand jury returned a nine-count indictment against the appellant.  The indictment charged conspiracy to commit armed robbery, 18 U.S.C. § 371 (count 1); robbery of a postal employee by use of a dangerous weapon, id. § 2114 (count 2); using and carrying a firearm during and in relation to a crime of violence, namely, the robbery, id. § 924(c)(1) (count 3); conspiracy to tamper with a witness, id. § 371 (count 4); witness tampering by means of attempted murder, id. § 1512(a)(1)(A) (count 5); using and carrying a firearm during and in relation to a crime of violence, namely, the attempted murder, id. § 924(c)(1) (count 6); obstruction of justice, id. § 1503 (count 7); conspiracy to obstruct justice, id. § 371 (count 8); and another incident of witness tampering by means of attempted murder, id. § 1512(a)(1)(A) (count 9). Twenty days later, the government filed an amended information pursuant to the Three Strikes Law, 18 U.S.C. § 3559(c), notifying the appellant that he was subject to a mandatory sentence of life imprisonment based upon an array of previous convictions for "serious violent felonies."  The qualifying convictions, all obtained in the Massachusetts courts, included a 1981 conviction for armed robbery, a 1987 conviction for

robbery and assault with a dangerous weapon, three 1988 convictions for armed robbery, and a 1989 conviction for armed robbery.

Prior to the commencement of trial, the district court severed counts 7 through 9 — a series of charges that revolved around an incident separate and apart from the robbery of the postal truck and the attempted murder of Donny DeSimone.[1] Trial commenced on the first six counts on April 3, 2000.

At trial, the court, relying on Fed. R. Evid. 801(d)(2)(E), conditionally admitted third-party testimony anent two sets of statements allegedly made by Sutherland. Citing Fed. R. Evid. 403, the court later reversed its field and struck that testimony. In a separate ruling, the court denied the appellant's attempt, pursuant to Fed. R. Evid. 804(b)(3), to introduce evidence concerning other statements allegedly made by Sutherland.

The court gave the case to the jury on April 24, 2000. The next day, the foreman informed the judge that an extraneous document — an unredacted copy of a second superseding indictment

---

[1]Those three counts (which figure prominently in the claim of jury taint, see infra Part III) revolve around allegations that, subsequent to his indictment and pretrial detention, the appellant enlisted the aid of a fellow inmate, William Niditch, to obstruct justice by committing perjury, and then tried to kill Niditch when Niditch became a government informant.

containing the text of the three severed counts — had found its way into the jury room. After conducting a thorough investigation, the trial court dismissed one juror, denied the appellant's motion for a mistrial, and instructed the eleven remaining jurors to resume deliberations.[2] On April 27, 2000, the jury found the appellant guilty on all six counts.

At the disposition hearing, the appellant conceded the existence of the prior convictions enumerated in the amended information, but asserted that he could not constitutionally be sentenced to life imprisonment under the Three Strikes Law. The district court rejected these importunings and sentenced the appellant to four concurrent terms of life imprisonment on counts 1, 2, 4, and 5, to be followed by mandatory consecutive terms of five and twenty years, respectively, on counts 3 and 6. This timely appeal followed.

We tackle the appellant's arguments in the order in which the underlying issues arose in the proceedings below. Thus, we begin with the evidentiary rulings and then address the

_____

[2]The Criminal Rules sanction verdicts by eleven-person juries in certain circumstances. See Fed. R. Crim. P. 23(b) (authorizing rendition of verdict by a jury of eleven if the trial judge concludes, after deliberations have begun, that it is "necessary" to excuse a juror for "just cause"). Although the appellant insists that the district court ought to have declared a mistrial because of jury taint, see infra Part III, he does not challenge the verdict on the ground that it was returned by a jury of fewer than twelve.

appellant's principal claim:  that the presence of a copy of the unredacted indictment in the jury room necessitated the declaration of a mistrial.  Finally, we consider the appellant's assault on the constitutionality of the Three Strikes Law.

## II.  EVIDENTIARY RULINGS

We divide this aspect of our discussion into two segments, corresponding to the appellant's assignments of error.

### A.  Conditionally Admitted Coconspirator Hearsay Statements.

The appellant maintains that the district court committed reversible error by initially admitting the DeSimones' testimony about two sets of statements allegedly made by Sutherland and then failing to declare a mistrial when it subsequently struck the conditionally admitted evidence.

According to the witnesses, Sutherland and the appellant arrived at the DeSimones' apartment shortly after the robbery, boasted about their commission of the crime, and distributed a portion of the swag to the DeSimones.  The government introduced testimony concerning the statements uttered while all four men were present, and the introduction of that evidence is not contested on appeal.  After receiving his share of the proceeds, Ronny DeSimone left the apartment to purchase drugs.  In Ronny's absence Sutherland and the appellant

made several statements to Donny DeSimone involving the details of the robbery. The admission of this testimony is also uncontested.

This brings us to the subject of the assigned error. By the time that Ronny had returned to the apartment, the appellant had departed. Over objection, Ronny testified that Sutherland then related that he had been armed with a handgun, that he had forced the mail carrier to drive away from the bank, and that a brown station wagon had been used as the getaway car.

The second set of statements dates back to August of 1995 — a period during which both Sutherland and Donny DeSimone were incarcerated at the Plymouth House of Corrections. Over objection, Donny testified that Sutherland acknowledged knowing about the appellant's attempt to murder him, and, indeed, bragged about ordering the appellant to kill both of the DeSimone brothers.

The district court provisionally admitted both sets of statements under Fed. R. Evid. 801(d)(2)(E). That rule permits the introduction of a statement offered against a party if the statement is made "by a coconspirator of a party during the course and in furtherance of the conspiracy." Id. The proponent of the statement bears the burden of establishing, by a preponderance of the evidence, "that a conspiracy embracing

-10-

both the declarant and the defendant existed, and that the declarant uttered the statement during and in furtherance of the conspiracy." United States v. Sepulveda, 15 F.3d 1161, 1180 (1st Cir. 1993); accord United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977). If these conditions are met, and if there is corroboration in the form of extrinsic evidence of the declarant's involvement in the conspiracy, then the hearsay barrier is avoided and the statement may be admitted. Sepulveda, 15 F.3d at 1182.

This court has constructed a model for the handling of evidence proffered under Rule 801(d)(2)(E). That model authorizes the trial court to admit conditionally alleged coconspirator statements. See United States v. Ciampaglia, 628 F.2d 632, 638 (1st Cir. 1980). At the close of all the evidence, the court then makes a final determination as to the admissibility of the evidence. Id. If the court ultimately concludes that the provisionally admitted evidence does not satisfy the applicable standard, it must "give a cautionary instruction to the jury, or, upon an appropriate motion, declare a mistrial if the instruction will not suffice to cure any prejudice." Id.

The appellant launches a two-pronged attack against the trial court's treatment of the challenged statements. First, he

argues that the foundational requirements for admissibility were not satisfied. Second, he asseverates that the contingent admission of the statements irretrievably poisoned the well, and that, when it became apparent that the evidence was not properly in the case, the trial court abused its discretion in eschewing a mistrial. We consider each foray separately.

    **1. Foundational Requirements.** Although the parties expend considerable energy in disputing the correctness vel non of the district court's decision to admit the proffered testimony conditionally, we need not determine whether the court had an adequate foundational basis for doing so. After all, the court struck the testimony at the close of all the evidence and instructed the jurors to disregard it without telling them the rationale behind either its conditional admission or its ultimate exclusion.[3] Because the jury never learned about the court's specific determination that the statements met the foundational requirements of Rule 801(d)(2)(E), it stands to reason that the jury could not have been prejudiced by that determination. Accordingly, we turn without further ado to the appellant's contention that the district court improvidently

---

[3]The court merely told the jury that "[t]he reasons [for striking the evidence] are several-fold and I don't think I really need to get into them too deeply, except to say that the evidence seems to me to be far too attenuated for you to look to it or rely upon it."

denied his motion for a mistrial — a motion premised on the notion that the statements, once admitted, engendered irretrievable and unfair prejudice (notwithstanding the fact that the jury was subsequently instructed to disregard them).

2. **The Motion for Mistrial.** At the close of all the evidence, the trial court excluded the disputed statements pursuant to Fed. R. Evid. 403 (which provides for the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury"). In itself, this is a rather unconventional use of the Ciampaglia model. Typically, as Ciampaglia itself illustrates, 628 F.2d at 638, the district court will provisionally admit evidence offered under Rule 801(d)(2)(E), evaluate at the close of the evidence whether the government has proven the prerequisites for admissibility by a preponderance of the evidence, and strike the evidence if it has not. Here, however, the trial court explicitly concluded that the government had satisfied the requirements of Fed. R. Evid. 801(d)(2)(E), yet nonetheless struck the disputed evidence because of Rule 403 concerns. Although this was a somewhat unorthodox use of the Rule 801(d)(2)(E) model, we think that, as a theoretical matter, it was within the court's authority. Cf. United States v. Van Nuys, 707 F. Supp. 465, 468 (D. Colo. 1989)

-13-

(concluding, after trial, that a significant amount of testimony admitted under Rule 801(d)(2)(E) should have been excluded pursuant to Rule 403).

As to the standard of review, all roads lead to Rome. We review a trial court's balancing under Rule 403 for abuse of discretion. United States v. Marrero-Ortiz, 160 F.3d 768, 774 (1st Cir. 1998). We likewise review decisions to deny motions for mistrial for abuse of discretion. United States v. Pierro, 32 F.3d 611, 617 (1st Cir. 1994). We discern no abuse here.

The trial court found that the challenged statements were tangential to the core conspiracies of robbery and attempted murder alleged in the indictment. Concerned that the unfairly prejudicial effect of the statements might outweigh their probative value, the court struck the evidence and instructed the jury to disregard it. The appellant argues that this palliative was insufficient because the court could not unring the bell — the evidence was so inflammatory that, once it was aired, no reasonable juror could be expected to disregard it.

Whether or not a jury can be expected, under proper instructions, to disregard particular evidence is a judgment call, and one as to which appellate courts typically cede a high degree of deference to the trial court. E.g., United States v.

<u>Freeman</u>, 208 F.3d 332, 344 (1st Cir. 2000) (upholding district court's determination that curative instruction regarding evidence provisionally admitted but later stricken sufficiently shielded defendant from unfair prejudice). We do not think that the limits of that deference were tested here.

To be sure, the statements attributed to Sutherland were unhelpful to the appellant, but their content was not shocking when measured against the rough-and-tumble evidence properly admitted in the case. Moreover, it is routinely presumed that jurors will follow curative instructions and put aside matters that the trial court determines have been improperly admitted. <u>United States</u> v. <u>Olano</u>, 507 U.S. 725, 740 (1993); <u>United States</u> v. <u>Houlihan</u>, 92 F.3d 1271, 1287 (1st Cir. 1996); <u>Sepulveda</u>, 15 F.3d at 1185. This presumption may be overcome only by showing that it is probable that: (1) responsible jurors will be unable to disregard the testimony; and (2) the testimony likely will have a seriously prejudicial effect on the aggrieved party. <u>Sepulveda</u>, 15 F.3d at 1185; <u>United States</u> v. <u>Paiva</u>, 892 F.2d 148, 160 (1st Cir. 1989). This inquiry is not conducted in a vacuum, but, rather, calls for an assessment of the impact of the stricken evidence in light of all the other evidence presented in the case.

Sepulveda illustrates the point. There, a police commander was permitted to testify as an expert witness over the defendant's objection. 15 F.3d at 1182. When cross-examination revealed that several of the opinions expressed by the witness lacked an adequate foundation, the defense moved midstream to strike the whole of the testimony. The trial court obliged. Id. at 1183. Even though the district judge instructed the jury to disregard the stricken testimony, the defendant moved for a mistrial on the ground that it had so prejudiced the jury that no curative instruction could put the genie back into the bottle. Id. at 1183-84.

On appeal, we upheld the trial court's denial of the motion. We did not find the stricken testimony to be so compelling that it threatened to sway the jury notwithstanding the court's explicit instructions to disregard it. Id. at 1185. In reaching this conclusion, we stressed that the cumulative nature of the stricken testimony completely undercut the defendants' plaint that the testimony carried the specter of lingering prejudice. Id.

So it is here. Both sets of statements were cumulative in nature. Sutherland's declarations to Ronny were largely duplicative of testimony offered by numerous witnesses and

admitted without opposition.[4]   Similarly, the central theme of

the second set of statements — the plot to kill Donny — was

fleshed out by a mass of evidence including, inter alia, the

appellant's own admissions and the introduction of the gun that

had malfunctioned.   To cinch matters, the district court

explicitly admonished the jury to disregard both sets of

statements, and gave a clear, concise curative instruction to

that effect.   In these circumstances, the appellant has not

successfully rebutted the presumption that the jury would follow

the judge's instructions.

        That ends this leg of our journey.   We conclude,

without serious question, that the lower court's refusal to

grant the appellant's motion for a mistrial fell well within the

wide encincture of its discretion.

### B.   __Statements Against Penal Interest__.

        The appellant next calumnizes the district court's

refusal to admit the  testimony of two witnesses to the effect

that Sutherland had stated (in two separate conversations) that

he and Donny DeSimone had collogued to rob the robbers, that is,

to steal the loot from the group that actually had hijacked the

---

[4]For example, Donny testified that, on the day of the
robbery, Sutherland and the appellant collectively related
details of the crime that were nearly identical to those that
Sutherland trumpeted after the appellant had left the apartment.

postal truck. The appellant proffered this testimony under Fed. R. Evid. 804(b)(3), which carves out a hearsay exception for, inter alia, "[a] statement which . . . at the time of its making . . . so far tended to subject the declarant to . . . criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Id. Such third-party testimony may only be admitted when the declarant is unavailable to testify. Id. Furthermore, an inculpatory statement "tending to expose the declarant to criminal liability and offered to exculpate the accused" will not be admitted "unless corroborating circumstances clearly indicate the trustworthiness of the statement." Id.

The district court refused to admit the testimony anent Sutherland's statements on two grounds, holding that the statements were not against Sutherland's penal interest and, in all events, were not sufficiently corroborated. We review the trial court's application of Rule 804(b)(3) for abuse of discretion. United States v. Patrick, 248 F.3d 11, 20, 23-24 (1st Cir.), cert. denied, 122 S. Ct. 620 (2001).

The determination of whether a statement is against a declarant's penal interest depends on the outcome of a fact-intensive inquiry into the surrounding circumstances.

-18-

<u>Williamson</u> v. <u>United States</u>, 512 U.S. 594, 603-04 (1994); <u>United</u> <u>States</u> v. <u>Costa</u>, 31 F.3d 1073, 1077 (11th Cir. 1994). Our review of the record compels the conclusion that the court below adequately evaluated the context in which the alleged statements were made. In the course of that endeavor, the court concluded that the tendered statements limned an alternative theory of the crime not pursued by the government, and represented a "sophisticated and subtle" effort by Sutherland and the appellant to avoid criminal responsibility on the precise charges lodged against them. On that basis, the court ruled that the statements were not against Sutherland's penal interest. That plausible rendition of the record was not an abuse of discretion.

At any rate, the district court's alternate ground for barring the statements is rock-solid. The court concluded that the corroborating evidence tendered by the appellant — that Sutherland allegedly told the same story to two different individuals on two separate occasions (hence, the two proffered statements) and that Donny DeSimone admitted at trial that he had told at least one other person that he had participated in the robbery — was insufficient to establish the trustworthiness of the statements. The strictures of Rule 804(b)(3) cannot be satisfied by a showing of speculative possibilities, but,

rather, demand meaningful corroboration of proffered testimony. See United States v. Mackey, 117 F.3d 24, 29 (1st Cir. 1997) ("[T]he requirement for corroboration is not unrealistically severe but does go beyond minimal corroboration.") (citation and internal quotation marks omitted). Measured by that yardstick, we cannot say that the district court's refusal to accept these minimally corroborative evidentiary fragments as sufficient indicia of trustworthiness constituted an abuse of discretion.

## III.  JURY TAINT

The appellant's cardinal claim is that the jurors' brief exposure to the text of the three severed counts necessitated a new trial. In approaching this claim, we first examine the appellant's assertion that the introduction of the unredacted indictment into the jury room, although accidental, triggered a presumption of prejudice. Rejecting that proposition, we proceed to assess the trial court's handling of the discovery that a deliberating jury had been exposed to information that carried the potential to do substantive damage. In the end, we conclude that the district court did not misuse its discretion in concluding that the jury's ability to render an impartial verdict remained intact (and that, therefore, the appellant's due process rights had not been infringed).

### A.  The Presumption of Prejudice.

The appellant's claim that the facts of this case demand a presumption of prejudice derives from the Supreme Court's decision in Remmer v. United States, 347 U.S. 227 (1954). There, as trial proceeded, a third party offered a bribe in exchange for a verdict favorable to the defendant. Id. at 228. The solicited juror informed the trial judge about the attempted bribery. Id. Instead of informing defense counsel, the judge asked the Federal Bureau of Investigation to look into the matter. Id. The jury found Remmer guilty. When he later learned about the attempted bribery, he moved unsuccessfully for a new trial. The court of appeals affirmed the district court's denial of this motion. 205 F.2d 277 (9th Cir. 1953). The Supreme Court reversed, declaring that:

> In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . . The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

347 U.S. at 229.

Although the Remmer Court spoke in expansive terms, the Court's holding has been cabined by two subsequent decisions. In Smith v. Phillips, 455 U.S. 209 (1982), a sitting juror

-21-

submitted an application for employment as an investigator for the district attorney's office. Id. at 212. The district attorney revealed this information only after the jury on which the job-seeker sat had convicted the defendant. Id. at 213. The trial court held a post-verdict hearing in which it determined that the pending application had not influenced the juror and denied the defendant's motion for a new trial. Id. at 213-14. The matter eventually reached the Supreme Court, which rejected the defendant's argument that the undisclosed application triggered Remmer's rebuttable presumption of prejudice. Id. at 217 (explaining that "due process does not require a new trial every time a juror has been placed in a potentially compromising situation"). The Smith Court then ruled that the hearing held by the trial court after the employment application had surfaced was sufficient under the circumstances. See id. at 217-18.

More recently, the Court declined to apply the Remmer presumption in a situation in which alternate jurors were present during jury deliberations. See Olano, 507 U.S. at 737-39. The Court held that the post-verdict inquiry into the facts, which showed that the irregularity had occurred but that the alternate jurors did not participate in the deliberations, afforded the defendant due process. See id. at 739-41.

-22-

This court, too, has hesitated to apply the <u>Remmer</u> presumption indiscriminately. The leading case is <u>Boylan</u> v. <u>United States</u>, 898 F.2d 230 (1st Cir. 1990). There, a magazine left fortuitously in the jury room contained an article suggesting that counsel for one of the defendants was the attorney of choice for "[e]very troubled mobster" in Boston. <u>Id.</u> at 258 & n.17. After guilty verdicts had been returned, the circulation of this literature in the jury room was brought to light. The district court held a comprehensive post-verdict hearing but found that the defendants' due process rights had not been infringed and denied their motions to set aside the verdict. We affirmed, rejecting a claim that the <u>Remmer</u> presumption applied. <u>Id.</u> at 260-62. We wrote:

> [T]he [<u>Remmer</u>] presumption is applicable only where there is an egregious tampering or third party communication which directly injects itself into the jury process. Put another way, the <u>Remmer</u> standard should be limited to cases of significant ex parte contacts with sitting jurors or those involving aggravated circumstances . . . .

<u>Id.</u> at 261.

We built upon this foundation in <u>United States</u> v. <u>Gomes</u>, 177 F.3d 76 (1st Cir. 1999). There, a juror at the defendant's second trial discovered a copy of the indictment that apparently had been left in the jury room after the first trial. <u>Id.</u> at 82. The indictment included, inter alia, a

-23-

charge on which the defendant had been acquitted at the first trial. Id. The district court undertook an appropriate inquiry but refused to apply the Remmer presumption. We upheld that determination, noting that while other aggravating circumstances might justify the application of a Remmer-type presumption, such a presumption was unavailable here because Remmer involved deliberate misconduct attributable to a party and that, in all events, the Gomes jurors were not exposed to substantively damaging information. Id.

In the wake of Smith and Olano, one court has concluded that Remmer is a dead letter. See United States v. Sylvester, 143 F.3d 923, 934 (5th Cir. 1998). Although we too have questioned Remmer's continuing vitality, see Gomes, 177 F.3d at 83, we need not decide today whether, or to what extent, it remains good law. Here, as in Boylan, the facts simply do not warrant the application of a Remmer presumption. Remmer involved an apparent attempt deliberately to influence the outcome of the case through corrupt machinations. In contrast, the record here is reasonably clear that the presence of the unredacted indictment in the jury room was due to an inadvertent error by court personnel, and the appellant has not claimed that the document was insinuated into the jury room for some nefarious purpose.

-24-

Moreover, the Remmer Court was especially troubled by the trial court's decision to request an FBI investigation based on scanty information obtained during an ex parte meeting with the prosecution. Remmer, 347 U.S. at 228. That element, too, is missing from the instant case. Here, the trial judge kept all counsel apprised and engaged throughout his in-depth investigation into the matter, and diligently fleshed out the circumstances of the taint-producing incident. Given the absence of any egregious circumstances, we conclude that Remmer is inapposite and decline to apply it here.[5]

In an effort to keep Remmer in play, the appellant cites two cases previously decided by this court. The first such case, United States v. Santana, 175 F.3d 57 (1st Cir. 1999), is clearly inapposite. That case turned on the trial court's decision to permit the jury to consider, as evidence of guilt, information — a view of the defendant's ears — presented to it for the first time during deliberations. See id. at 63-64. Here, unlike in Santana, the information that the jury improperly acquired during its deliberations (the unredacted

---

[5]We leave for another day the question of whether a jury's exposure to substantively damaging information may sometimes occur under circumstances so aggravated as to warrant the application of the Remmer presumption even without deliberate misconduct (and if so, what those circumstances might comprise). That question simply is not presented here.

-25-

indictment) was not received as evidence, and the court told the jury, in no uncertain terms, to disregard it.

The appellant's reliance on United States v. Maguire, 918 F.2d 254 (1st Cir. 1990), is similarly misplaced. There, the trial judge erroneously instructed the venire during jury empanelment about a count that had been severed. See id. at 266. The court denied the defendant's motion for a mistrial, but told the jury to disregard the reference to the severed count. Id. The jury convicted the defendant. We upheld the conviction, concluding that the error was harmless beyond a reasonable doubt. Id. at 266-68. Although the panel did observe, in dictum, that the "reference to the severed count was presumptively prejudicial," id. at 267, we reject the appellant's effort to attach talismanic significance to that allusion. The panel neither cited Remmer nor conducted any analysis suggesting that it was undertaking a Remmer-based inquiry.

To conclude, we abjure any extension of the Remmer presumption to these facts. The appellant's claim of jury taint must be judged by more conventional standards. It is to that task that we now turn.

**B.   The Merits of the Appellant's Claim.**

We start this phase of our inquiry by revisiting certain generally applicable legal principles. We then describe the trial court's investigation into the possibility of jury taint, its findings, and its resolution of the matter. Finally, we evaluate the court's handling of the situation.

1. **The Legal Landscape.** Where, as here, a colorable claim of jury taint surfaces during jury deliberations,[6] the trial court has a duty to investigate the allegation promptly. United States v. Hunnewell, 891 F.2d 955, 961 (1st Cir. 1989). The purpose of that inquiry is twofold: to ascertain whether some taint-producing event actually occurred, and if so, to assess the magnitude of the event and the extent of any resultant prejudice. Boylan, 898 F.2d at 258. If the court finds both a taint-producing event and a significant potential for prejudice, the court must then consider the extent to which

_____

[6]The case at bar involves a trial court's pre-verdict handling of an allegation that a deliberating jury was accidentally exposed to substantively damaging information. The timing of the court's inquiry distinguishes it from the vast majority of the reported cases, most of which deal with claims of jury taint raised after the jury has returned a verdict. E.g., Smith, 455 U.S. at 213-14; Boylan, 898 F.2d at 262. In that situation, appellate courts frequently have framed the inquiry in terms of harmless error, asking, in effect, whether the trial court's determination that an improper outside influence did not taint the jury verdict was supportable. Where the claim of jury taint surfaces before the jury has completed its deliberations, the harmless-error test is a poor fit (and, therefore, of scant utility).

prophylactic measures (such as the discharge of particular jurors or the pronouncement of curative instructions) will suffice to alleviate that prejudice. See Gomes, 177 F.3d at 82. In some instances, a likelihood of residual prejudice may remain despite the court's best efforts. In that event, the court must grant a timely motion for a mistrial (if one is made). The objective of this painstaking process is to ensure that the parties "receive[] the trial by an unbiased jury to which the Constitution entitles them." United States v. Anello, 765 F.2d 253, 258 (1st Cir. 1985).

Conducting an inquiry into a colorable question of jury taint is a delicate matter, and there is no pat procedure for such an inquiry. Evans v. Young, 854 F.2d 1081, 1083-84 (7th Cir. 1988) (explaining that trial courts have wide discretion to evaluate pre-verdict claims of alleged jury misconduct as they deem appropriate); Hunnewell, 891 F.2d at 961 (stating that the trial court has "considerable leeway" in determining how to structure its investigation); see also Boylan, 898 F.2d at 258 (noting that "the kaleidoscopic variety of possible problems counsels in favor of flexibility"). Consequently, the trial court has wide discretion to fashion an appropriate procedure for assessing whether the jury has been exposed to substantively

damaging information, and if so, whether cognizable prejudice is an inevitable and ineradicable concomitant of that exposure.

**2. The Proceedings Below.** This brings us to the proceedings below. The introduction of an extraneous document into the jury room during deliberations is always a cause for concern. The intrusion was effected in this instance by an indictment — an official document bearing the government's imprimatur. That document contained three counts that were not before the jury, and those counts charged the appellant with serious malefactions (of which the jury had no other knowledge). Thus, the acknowledged presence of the unredacted indictment in the jury room gave rise to a colorable claim of actual prejudice and posed a significant threat to the jurors' ability to render an impartial verdict. The question, then, reduces to whether the trial court investigated the claim appropriately and resolved it in a satisfactory manner.

The lower court recognized these realities. Upon learning that the unredacted indictment had infiltrated the jury room, the court immediately alerted counsel and solicited suggestions about the most advisable way to handle the situation. Adopting defense counsel's recommendation, the court assembled the jurors, informed them of the need for an inquiry, and instructed them not to discuss the matter amongst

themselves.  The court then proceeded to interview the jurors one by one.

Although the individual voir dire examinations revealed some slight discrepancies in the jurors' accounts concerning their exposure to the text of the unredacted indictment, the differences are not material here.  For the most part, a consistent picture emerged.  The jurors agreed that, at the start of the second day of deliberations, one of their number noticed a copy of the indictment that contained some "extra" counts.  He mentioned this oddity to his fellow venirepersons, and, at the urging of some of them, read aloud the text of count 7 (an obstruction of justice charge).  After a brief discussion, the jurors concluded that the document did not belong in the jury room, and the jury foreman brought it to the court security officer.  He told the officer that:  "We found this document in the group of materials and it doesn't seem to belong there.  It has more counts than are in the verdict slip."

After concluding this initial round of voir dire examinations, the trial court made the following finding (out of the jurors' earshot):

> There are inconsistencies among the recollections. . . .  None of them seem to be material.  There is a core quality to this:  First, a recognition that there was something unusual; second, a recognition that there was something that was not

> properly before them; number three, their recognition that they should put it out of their deliberations, certain facts and circumstances . . . . In fact, they responded — from my perspective — precisely the way jurors are supposed to respond . . . if they were exposed to extraneous information, including bringing it to my attention . . . .

The court then reassembled the jurors, instructed them that it was their duty to decide the case based on their "evaluation only of the evidence that's presented to you here in trial and not by consideration of other extraneous matters," and launched into a strongly-worded curative instruction.[7] At that juncture, the court undertook a second round of individual voir dire examinations, this time focusing on each individual juror's ability to "put out of [his or her] mind[] entirely the facts and circumstances of the extraneous document" so that he or she might decide the case solely on the evidence introduced at trial. Eleven of the twelve jurors expressed confidence that

---

[7]The court stated in pertinent part:

> [T]hroughout, I've been telling you that you decide this case solely on the basis of evidence that's actually presented to you. . . . [T]his extraneous document to which you were unfortunately and inadvertently exposed which has nothing to do with the charges in this case, should not be considered a part of the charges in this case. Your responsibility, as I said, is to decide this case solely on the basis of evidence that was presented to you as to Counts 1 through 6.

they could function in that pristine fashion and satisfied the court of their ability to do so. Without objection, the court dismissed the lone dissenter. After rejecting the appellant's challenges to three additional jurors, the judge directed the remaining jurors to resume deliberations with a view toward reaching a verdict. See Fed. R. Crim. P. 23(b).

3. **The Adequacy of the Trial Court's Handiwork.** We now test the trial court's handiwork against the abuse-of-discretion benchmark. See Boylan, 898 F.2d at 262; Hunnewell, 891 F.2d at 961. In this context, however, review for abuse of discretion connotes a certain rigor.

As we use the term, the abuse-of-discretion standard encompasses multiple layers of inquiry. See Koon v. United States, 518 U.S. 81, 98-100 (1996). Under it, we accept the trial court's factual findings only to the extent that they are not clearly erroneous. United States v. Castro, 129 F.3d 226, 229 (1st Cir. 1997). We next examine the legal principles on which the court premised its decision, mindful that an error of law invariably constitutes an abuse of discretion. In re Grand Jury Subpoena, 138 F.3d 442, 444 (1st Cir. 1998). This particular inquiry is conducted without any special deference to the trial court's views, United States v. Snyder, 136 F.3d 65, 67 (1st Cir. 1998), and extends to the court's application of

the law to the facts as found.  Only then do we ask whether, given the totality of the circumstances then and there obtaining, the sum of the trial court's acts and omissions constituted a misuse of its discretion.

Starting from this vantage point, we turn first to the procedure employed below.  For all practical purposes, the lower court replicated the <u>Boylan</u> model — a model that we previously have deemed "methodologically sound."  898 F.2d at 259.  The court engaged counsel for both sides in an ongoing dialogue about the most appropriate way in which to handle the needed investigation, examined each juror twice, and pursued no fewer than eight lines of questioning proposed by defense counsel. The court's probing into the extent of the jurors' exposure to the extraneous information and its potential impact on their ability to render an impartial verdict was thorough and incisive.  The court gave the jury clear and emphatic curative instructions.  Last — but surely not least — the court made explicit findings that are amply rooted in the transcript of the two rounds of voir dire examinations and that make considerable sense when scrutinized against the record of the trial as a whole.

The appellant raises two specific objections to the trial court's findings.  First, the appellant takes aim at a

statement made by a retained juror during the second round of questioning. When pressed by the judge to expound upon his comment that "the gravity of the discussion weighs some," the juror responded that: "I believe that the outcome of the trial and the verdict turns on the very unexpected and serious change in the evidence presented." Considered in isolation, that comment might raise a reader's eyebrow — but the colloquy that ensued between the judge and the juror makes manifest that the juror's remark was not a cause for concern. In that colloquy, the juror assured the judge that he would not consider the extraneous material and characterized his earlier statement as "a poor choice of words." Viewed in that light, we do not believe that the court's decision to retain the juror constituted an abuse of discretion.

Second, the appellant argues that the court's finding that the incident yielded no residuum of unfair prejudice failed to take into account that the jury's exposure to the severed counts undermined his principal trial strategy. In this regard, defense counsel credibly claimed that she had made a conscious decision to avoid any reference to the Niditch incident (which comprised the subject matter of the three severed counts, see supra note 1) in order to preclude "opening the door" to the

government's introduction of "highly charged" evidence related to that topic.

The problem with this argument is that the inadvertent exposure of the jury to the unredacted indictment did not lead to the introduction of any <u>evidence</u> concerning the Niditch incident, and the court found as a fact that the retained jurors were fully able to put aside their brief encounter with the allegations contained in the severed counts. The fact that the exposure was to an indictment, rather than to information of evidentiary quality, weighs in the government's favor. Before deliberations commenced (and, thus, before any exposure to the extraneous information occurred), the court had clearly explained that "[t]he indictment is the document that frames the issues, the charges, the criminal violations that the Government believes it can prove. But . . . the indictment isn't evidence . . . . It's simply the document that you look to to understand what it is that the Government is undertaking to prove in this case." The court reinforced this instruction by telling the jurors, after the unredacted indictment surfaced, to "[p]ut entirely out of your mind any exposure any of you may have had to earlier forms of the kinds of charges the Government was thinking about here." Appellate courts ordinarily presume that a jury will follow the trial judge's specific instructions in a

criminal case, e.g., Olano, 507 U.S. at 740; Houlihan, 92 F.3d at 1287; Sepulveda, 15 F.3d at 1185, and there is no reason to abandon that presumption here.

In sum, the record reflects that the lower court handled its investigation into the "jury taint" question with consummate care. Its detailed findings and its conclusion that the jurors' accidental exposure to the unredacted indictment caused no ineradicable prejudice are fully supportable. In words that resonate here, the Smith Court observed that "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." 455 U.S. at 217. The court below carried out this mandate to the letter. Consequently, we hold that the court acted well within the scope of its discretion in structuring the inquiry into the question of jury taint, in excusing a single juror, and in concluding that the remaining jurors' ability to render an impartial

verdict had not been compromised.[8]  The appellant received all the process that was due.

## IV.  THE THREE STRIKES LAW

In this case, the district court invoked the Three Strikes Law, 18 U.S.C. § 3559(c), to sentence the appellant to multiple terms of life imprisonment.  The appellant challenges that determination on constitutional grounds.  Before addressing this challenge, we describe the statutory scheme.

The Three Strikes Law is of relatively recent vintage. It dictates mandatory life imprisonment for any person convicted in a federal court of a "serious violent felony" if, inter alia, that person has been convicted on two or more prior occasions of "serious violent felonies."  Id. § 3559(c)(1)(A)(i).  The statute characterizes various federal and state offenses as

_____

[8]Citing Santana, 175 F.3d at 65, and Lacy v. Gardino, 791 F.2d 980, 982-83 (1st Cir. 1986), the appellant posits that where, as here, extrinsic information is considered by the jury, harmless error analysis must apply.  But those cases involved the jury's consideration of information of evidentiary quality, and the claim of jury taint arose after trial (when any harm could not be undone).  Here, however, the harmless-error test is a poor fit.  See supra note 6.  The matter came to the trial judge's attention before the jury reached a verdict, and the judge, after due investigation, gave a timely curative instruction.  Furthermore, the information to which the jury was exposed was not evidence; the retained jurors warranted that they would not consider it; and they added that, in all events, what they had seen or heard would not influence their judgment. Under these vastly different circumstances, there is no constitutional error and, hence, no need for harmless error analysis.

serious violent felonies.  It places three federal robbery statutes in this category, and, pertinently, adds a generic definition that encompasses:

> [A]ny other offense punishable by a maximum term of imprisonment of 10 years or more that has as an element the use, attempted use, or threatened use of physical force against the person of another or that, by its nature, involves a substantial risk that physical force against the person of another may be used in the course of committing the offense.

Id. § 3559(c)(2)(F)(ii).

The Three Strikes Law also includes a disqualification provision that offers a criminal defendant the opportunity to remove some crimes that otherwise would qualify as serious violent felonies (and, therefore, count as "strikes") from the "three strikes" calculation.  The disqualification provision states, in relevant part, that:

> (A) Robbery, an attempt, conspiracy, or solicitation to commit robbery . . . shall not serve as a basis for sentencing under this subsection if the defendant establishes by clear and convincing evidence that —
>
> (i) no firearm or other dangerous weapon was used in the offense and no threat of use of a firearm or other dangerous weapon was involved in the offense; and
>
> (ii) the offense did not result in death or serious bodily injury . . . to any person.

Id. § 3559(c)(3)(A)(i)-(ii). The disqualification provision places the burden of proof squarely on the defendant to prove by clear and convincing evidence that, notwithstanding the government's allegations, his prior felony convictions do not constitute qualifying offenses. See id.

In this venue, the appellant does not quarrel with the district court's finding that, on their face, the six prior convictions catalogued by the government constitute "strikes" under the Three Strikes Law. He does, however, advance two arguments that implicate the law's constitutionality. We consider these arguments sequentially.

## A. Apprendi.

The appellant contests the power of the court to take the prior convictions into account, noting that they had neither been referenced in the indictment nor proven to a jury beyond a reasonable doubt. Thus, his thesis runs, the Supreme Court's recent decision in Apprendi v. New Jersey, 530 U.S. 466 (2000), prohibits the imposition of an enhanced sentence.

This argument is a non-starter. The core holding of Apprendi is that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490 (emphasis

-39-

supplied).  We think the Court meant exactly that — and we have said so.

We recently considered and rejected a materially indistinguishable argument in United States v. Gomez-Estrada, 273 F.3d 400, 401 (1st Cir. 2001).  We noted there that the Apprendi Court explicitly exempted sentence-enhancement provisions based upon prior criminal convictions from the scope of its holding.  Id. at 402 (citing Apprendi, 530 U.S. at 490); see also Almendarez-Torres v. United States, 523 U.S. 224, 226-27, 247 (1998) (upholding Congress's decision to treat prior convictions as a sentencing factor rather than an element of a federal criminal offense).  Because we have ruled unequivocally that the strictures of Apprendi do not apply to sentence-enhancement provisions based upon prior criminal convictions, see Gomez-Estrada, 273 F.3d at 401-02; United States v. Terry, 240 F.3d 65, 73-74 (1st Cir.), cert. denied, 121 S. Ct. 1965 (2001), we reject the appellant's Apprendi-based challenge.

### B.  Shifting of the Burden of Proof.

The appellant's second argument is more sophisticated. He says that 18 U.S.C. § 3559(c)(3)(A) violates constitutional due process guarantees because it shifts the burden of proof to the defendant and requires him to establish by "clear and convincing" evidence that his prior convictions are

nonqualifying (and, hence, not countable as "strikes" under the Three Strikes Law).  Refined to bare essence, the appellant's thesis is that the disqualification provision violates due process in two related ways:  (1) by requiring the defendant to prove that previous offenses are nonqualifying, and (2) by requiring that he do so under a heightened standard.  These constitutional claims engender de novo review.  United States v. Zorrilla, 93 F.3d 7, 8 (1st Cir. 1996); United States v. Gifford, 17 F.3d 462, 471-72 (1st Cir. 1994).

Our starting point is the Court's decision in Patterson v. New York, 432 U.S. 197 (1977).  There, the defendant challenged a New York law that permitted a person accused of murder to invoke the affirmative defense of "extreme emotional disturbance" to mitigate the charged crime to manslaughter.  Id. at 198-99 & nn.2-3.  The New York criminal code assigned to the defendant the burden of establishing the "extreme emotional disturbance" defense by a preponderance of the evidence.  Id. at 200.  The defendant failed in his effort to mitigate the charge against him, and appealed his murder conviction on the ground that the burden-shifting component contravened due process.

Noting that it was well within the state's power to criminalize intentional killings and mete out substantial punishment to individuals convicted of such crimes, the Supreme

-41-

Court emphasized that, incident thereto, the state had the power to recognize factors that mitigated the degree of criminality or punishment.  Id. at 209.  As a logical consequence, the state was entitled to "assure itself that the [mitigating] fact has been established with reasonable certainty" by requiring the defendant to prove such a fact by a preponderance of the evidence.  Id.  Thus, as long as the state has proven all elements of the crime beyond a reasonable doubt, its reallocation of the burden of proof in an affirmative defense did not violate due process.  See id. at 205-06.

Whereas Patterson raised his affirmative defense at trial, the Three Strikes Law comes into play at the sentencing stage of a criminal proceeding.  But this is a distinction without a difference:  the sentencing process is surely no more exacting than the process of establishing guilt.  It therefore stands to reason that Patterson applies with equal force to burden-shifting affirmative defenses made available at the sentencing stage of criminal proceedings — and that such a paradigm does not offend the Constitution.  Accord United States v. Wicks, 132 F.2d 383, 389 (7th Cir. 1997) ("If Patterson allows such a result even at the stage of the trial where guilt or innocence is decided, it follows that due process does not

prohibit the kind of affirmative defense at the sentencing stage found in § 3559(c)(3)(A).").

An equally germane consideration is that antecedent "strikes" that factor into the Three Strikes calculation take the form of prior convictions. The Supreme Court has upheld a state sentence enhancement provision requiring a recidivist defendant to shoulder the burden of proof of establishing the invalidity of prior convictions. Parke v. Raley, 506 U.S. 20, 34 (1992). The Court reasoned that the "'presumption of regularity' that attaches to final judgments" made it appropriate to assign a proof burden to the defendant. Id. at 29. Like the contested state statute in Parke, the Three Strikes Law initially presumes that prior convictions falling under one of the statutorily enumerated definitions are valid, 18 U.S.C. § 3559(c)(1)-(2), and then provides the defendant with the opportunity to disqualify the convictions, id. § 3559(c)(3).

Taken together, Patterson and Parke convince us that a paradigm that allows the defendant to raise an affirmative defense during the sentencing phase of criminal proceedings, but then shifts the burden of proof to him to establish the defense, does not violate due process. Nor is this an eccentric view of the law: several other courts have reached this same conclusion. See United States v. Gatewood, 230 F.3d 186, 189-90

-43-

(6th Cir. 2000) (en banc), <u>cert</u>. <u>denied</u>, 70 U.S.L.W. 3443 (No. 01-7283) (Jan. 14, 2002); <u>United States</u> v. <u>Ferguson</u>, 211 F.3d 878, 887 (5th Cir.), <u>cert</u>. <u>denied</u>, 531 U.S. 909 (2000); <u>United States</u> v. <u>Smith</u>, 208 F.3d 1187, 1190 (10th Cir. 2000); <u>United States</u> v. <u>Kaluna</u>, 192 F.3d 1188, 1196 (9th Cir. 1999) (en banc); <u>Wicks</u>, 132 F.2d at 389.

The appellant's related asseveration is that section 3559(c)(3)(A)'s placement of a heightened evidentiary burden on criminal defendants — clear and convincing evidence — contravenes their right to due process.[9] This asseveration also lacks force.

It is transparently clear that Congress had the power to enact a law that mandated life imprisonment for recidivist felons who committed a series of serious violent felonies or drug offenses. Although it was not constitutionally required to do so, Congress thought it efficacious to include a provision that exempted a particular subset of offenses from consideration as "strikes." Given that Congress was under no obligation to provide defendants with such a dispensation in the first place, there is no principled reason why Congress could not craft such a provision in the manner that it deemed appropriate. <u>See</u>

_____

[9]Interestingly, the appellant offers no enlightenment as to how, if a heightened standard did not obtain, he might be able to "disqualify" any or all of his six prior convictions.

-44-

<u>Gatewood</u>, 230 F.3d at 191.  As the Sixth Circuit astutely observed:

> If Congress can choose whether or not to provide a defense, it follows that the burden of proof Congress places on such a defense cannot be unconstitutional. . . . It is the prerogative of the legislative branch to determine whether a recidivist defendant is subject to an enhanced statutory punishment and what, if any, affirmative defense applies after a defendant has previously been adjudged guilty.

<u>Id.</u>

The appellant avers that <u>Cooper</u> v. <u>Oklahoma</u>, 517 U.S. 348 (1996), compels a different conclusion.  We do not agree. <u>Cooper</u> involved a constitutional challenge to an Oklahoma law that presumed a criminal defendant competent to stand trial unless she mustered clear and convincing proof of her incompetence.  <u>Id.</u> at 350.  A unanimous Supreme Court struck down the law on the ground that the heightened evidentiary standard violated due process.  <u>Id.</u> at 369.  Starting with the bedrock principle that the state can try only a competent criminal defendant, the Court ruled that this principle trumped the state's interest in ensuring the efficient operation of its criminal justice system through the application of a heightened standard of proof.  <u>Id.</u> at 367.

The competency statute that the Cooper Court annulled is clearly distinguishable from the disqualification provision in the Three Strikes Law. The crux of the matter is that a criminal defendant has a fundamental constitutional right not to be forced to stand trial while incompetent — but he has no comparable right to a statutorily created affirmative defense. See Gatewood, 230 F.3d at 191 ("There is no fundamental constitutional right to avoid an enhanced sentence based on prior convictions simply because the prior convictions were nonviolent."). The Cooper Court drove home that precise point by expressly distinguishing the Oklahoma competency provision from the statutorily created affirmative defense addressed and approved in Patterson. See Cooper, 517 U.S. at 367-68 ("Unlike Patterson, which concerned procedures for providing a statutory defense, we consider here whether a State's procedures for guaranteeing a fundamental constitutional right are sufficiently protective of that right.").

That gets the grease from the goose. Since the disqualification provision in the Three Strikes Law is functionally equivalent to the statutory affirmative defense discussed in Patterson, the holding in Cooper is inapposite here. It follows inexorably that the burden placed upon criminal defendants to establish by clear and convincing

evidence that their prior convictions are nonqualifying offenses pursuant to 18 U.S.C. § 3559(c)(3) is not incompatible with due process.  Accord Gatewood, 230 F.3d at 191; Ferguson, 211 F.3d at 887.

## V.  CONCLUSION

We need go no further.  Having canvassed the appellant's asseverational array and rejected his sundry claims of error, we affirm the judgment below.

**Affirmed.**