# United States Court of Appeals
## For the First Circuit

No. 14-2232

UNITED STATES OF AMERICA,

Appellee,

v.

CARLOS R. CAMACHO-SANTIAGO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Thompson, Dyk,* and Kayatta,
Circuit Judges.

Raul S. Mariani Franco for appellant.
Thomas F. Klumper, Assistant U.S. Attorney, Senior Appellate
Counsel, United States Attorney's Office, with whom Rosa Emilia
Rodríguez-Vélez, United States Attorney, and Mariana E. Bauzá-
Almonte, Assistant U.S. Attorney, Chief, Appellate Division, were
on brief, for appellee.

March 15, 2017

---

* Of the Federal Circuit Court of Appeals, sitting by
designation.

**KAYATTA**, **Circuit Judge**.  A jury convicted Carlos Camacho-Santiago ("Camacho") of two counts of drug trafficking based on his involvement in a criminal conspiracy to move cocaine in luggage stowed on commercial airline flights from Puerto Rico to the mainland United States.  On appeal, Camacho raises an array of challenges to his conviction based on the contention that he was not a member of the conspiracy proven at trial.  He also argues that his conviction depended upon the erroneous admission of hearsay evidence and that the district court failed to do enough to ensure the jury could fairly render a verdict.  Finding the evidence sufficient to sustain his conviction as a member of the conspiracy charged in the indictment and proven at trial, and finding no other reversible error, we affirm.

## I.  Background

In May 2012, a grand jury indicted Camacho and nineteen others on two criminal counts arising out of a drug trafficking conspiracy.  We described the charged conspiracy in our recent opinion vacating the conviction of another individual, Nelson Pereira.  See United States v. Pereira, 848 F.3d 17, 19-20 (1st Cir. 2017).  In brief, the indictment alleged that Wilfredo Rodríguez-Rosado ("Rodríguez")--not indicted here--created and ran an operation using baggage handlers to smuggle cocaine on American Airlines flights from Puerto Rico to the mainland over roughly a

ten-year period beginning in 1999.  The indictment charged Camacho with two counts of joining and aiding and abetting this conspiracy.

Rodríguez did not oversee the distribution process in the continental United States, nor was he the original source of the cocaine that made its way onto American Airlines flights.  The cocaine was furnished by a variety of suppliers who brought their cocaine supply to Rodríguez's people and worked with them to get cocaine packaged and delivered to American Airlines employees at Luis Muñoz Marín International Airport in San Juan.  One such supplier was Carlos Arce Lopez ("Arce"), who first connected with Rodríguez through Camacho.

Gerardo Torres Rodríguez ("Torres"), one of the government's key witnesses against Camacho, testified that Rodríguez offered to forgive a debt Camacho owed him if Camacho brought him a new supplier, and that Camacho accepted that offer by bringing Arce to Rodríguez.  According to Torres, on at least three occasions, Camacho traveled with him to Newark to test the route for Arce, pick up suitcases of drugs, and collect money to return to Puerto Rico.  Arnaldo Sierra-Menendez ("Sierra") also testified that Camacho worked for Arce and that on one occasion when some cocaine went missing, Camacho and Rodríguez confronted Sierra about his involvement in the drugs' disappearance.  Sierra testified that Camacho pointed a gun at him while asking what happened to the cocaine and threatening to kill him.  The only

other witness who offered first-hand testimony as to Camacho's involvement in the conspiracy was Javier Olmo-Rivera ("Olmo"), a member of Rodríguez's organization who testified that every supplier had an intermediary who delivered the cocaine to the airport and facilitated the trafficking group's connection to the supplier, and that Camacho was the person who delivered Arce's cocaine.

Rodríguez did not testify, but many other members of the conspiracy did. Torres and Sierra both testified as to statements Rodríguez made concerning the conspiracy and Camacho's alleged role in it, testimony the court allowed as relating out-of-court statements of a coconspirator. The jury convicted Camacho on both counts, and the judge sentenced him to 360 months' imprisonment. This timely appeal followed.

## II. Discussion

Camacho begins with two arguments that train on the nature of the conspiracy proven at trial. He contends that the evidence was insufficient to convict him of the one conspiracy charged. Alternatively, he contends that the jury should have been told more expressly that proof of multiple conspiracies rather than the one conspiracy alleged in the indictment was not grounds for conviction. Third, Camacho challenges the admission of what he says is hearsay evidence. Fourth, he requests a new trial because he claims the jury was twice contaminated. Fifth, he avers

that the court read testimony back to the jury during deliberations without taking adequate steps to ensure the jury did not place undue weight on what it heard.[1]   We address these arguments in their logical order.

**A.    One Conspiracy, Or More?**

The indictment alleged a conspiracy to "possess with intent to distribute [cocaine]."  The specific object of the conspiracy was "to smuggle into American Airlines commercial aircrafts, suitcases filled with large amounts of cocaine to be transported from Puerto Rico to the continental United States with the intent to generate and obtain large monetary profits."  Against this backdrop, the essence of Camacho's conspiracy-related arguments is that the evidence showed at least two conspiracies, not one, and he was not a part of the only one alleged in the indictment.  To demonstrate the existence of at least two conspiracies rather than one, he describes the evidence as perhaps showing him in a conspiracy with Arce, as Arce's employee, to supply cocaine to Rodríguez, who in turn ran a separate conspiracy

---

[1] In the table of contents to his opening brief, Camacho also lists as one issue for review whether "the district court committed reversible error by applying a higher than legally mandated guideline range for Mr. Camacho and when it sentenced Camacho to 360 months based on such erroneous guideline."  His briefs, though, never address this issue or argue that such error occurred.  The issue is therefore waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

to smuggle cocaine into the continental United States. This "two-conspiracy" description provides the launch pad for two arguments: the evidence was insufficient to convict Camacho of a single conspiracy; alternatively, the evidence was at least ambiguous enough to warrant what Camacho calls a "multiple conspiracy" instruction. By that he means an instruction telling the jury that it should decide whether the government has proved one or multiple conspiracies, and that Camacho must be found not guilty if he did not join the conspiracy alleged, even if he joined another. Camacho requested such an instruction, but it was not given. Because the argument challenging the instructions is an easier one for a defendant to support, we address it first.

"A trial court should grant a defendant's request for a multiple conspiracy instruction if, on the evidence adduced at trial, a reasonable jury could find more than one such illicit agreement, or could find an agreement different from the one charged." United States v. Ramírez-Rivera, 800 F.3d 1, 45 (1st Cir. 2015) (quoting United States v. Brandon, 17 F.3d 409, 449 (1st Cir. 1994)). "To determine whether a set of criminal activities constitutes a single conspiracy, we generally look to three factors: (1) the existence of a common goal, (2) overlap among the activities' participants, and (3) interdependence among the participants." United States v. Ciresi, 697 F.3d 19, 26 (1st Cir. 2012). "A general scheme may exist 'notwithstanding

variations in personnel and their roles over time.'" Id. (quoting United States v. Shea, 211 F.3d 658, 665 (1st Cir. 2000)). "'The goal of selling cocaine for profit' satisfies the common goal requirement. That each defendant had an interest in furthering the distribution of cocaine is also sufficient evidence that they shared a common goal with the other participants." United States v. Portela, 167 F.3d 687, 695 (1st Cir. 1999) (footnotes and citation omitted) (quoting United States v. Wilson, 116 F.3d 1066, 1075 (5th Cir. 1997)).

We review a preserved challenge to a district court's decision not to provide a multiple conspiracy instruction for abuse of discretion, but "[w]e will reverse a district court's decision not to provide a multiple conspiracy instruction only if the defendant can show that he suffered substantial prejudice." United States v. Díaz, 670 F.3d 332, 350 (1st Cir. 2012) (citing United States v. De La Cruz, 514 F.3d 121, 139 (1st Cir. 2008)). "In the context of alleged multiple conspiracies, the defendant's main concern is that jurors will be misled into attributing guilt to a particular defendant based on evidence presented against others who were involved in a different and separate conspiratorial scheme." Brandon, 17 F.3d at 450.

The evidence at trial, to the extent it pointed a finger at Camacho, was unambiguous on three points: securing a supply of cocaine was an essential element of Rodríguez's conspiracy to

distribute; Rodríguez recruited Camacho into the conspiracy to find a supplier; and Camacho knew, in great detail, how the smuggling portion of the conspiracy operated, and actually tested out the route and delivered drugs and money himself. In short, if the evidence was to be believed at all, there was: (1) "the existence of a common goal, (2) interdependence among participants, and (3) overlap among the participants." United States v. Dellosantos, 649 F.3d 109, 111 (1st Cir. 2011).

The fact that the conspiracy had several integrated steps does not mean that each step could reasonably be seen as a separate conspiracy, at least where the evidence shows Camacho was aware of all the steps. See, e.g., United States v. Hansen, 434 F.3d 92, 101 (1st Cir. 2006) (observing that it was not plainly erroneous for a district court to refuse to give a multiple conspiracy instruction where the evidence demonstrated the defendant knew the extent of the conspiracy alleged and acted in furtherance of it). A person need not be involved at every level of a conspiracy to be a participant in it. See Brandon, 17 F.3d at 451. At any point in time in the course of the conspiracy, it could be said of Camacho that which the indictment alleged: he was involved in a scheme to possess cocaine with the intent of shipping it on commercial flights into the continental United States for sale. By supplying drugs to Rodríguez and ensuring that those drugs successfully made their way through his packaging-

and-distribution operation, Camacho's "aspect of the scheme [was] necessary [and] advantageous to the success of" Rodríguez's distribution scheme. Portela, 167 F.3d at 695. To find on this evidence that Camacho was engaged only in a conspiracy with Arce to supply cocaine to Rodríguez would be like saying that a center on a football team was engaged only in a conspiracy to supply the ball to the quarterback but was otherwise not a part of the team.

Nor did the government's case suggest any alternative conspiracy that might have attracted jurors as a possible basis for convicting Camacho. He does point to two snippets of testimony that Rodríguez and Camacho met each other when they "started" "doing business" with an individual named Tun Tun. The evidence was obviously aimed at explaining how Camacho and Rodríguez met. It concerned events "much" before 1999. While a juror could have inferred that the "business" was drug smuggling, the testimony contained no details at all about any smuggling at that time, or about Camacho's involvement. Nor was it presented or argued as a possible alternative conspiracy upon which jurors might rest a verdict.

Camacho also argues that a multiple conspiracy instruction was necessary because of evidence of a smuggling conspiracy that predated the one alleged and that involved Sierra, Rodríguez, and another drug trafficker; evidence of a similar, concurrent drug-trafficking conspiracy in which another drug

trafficker used Rodríguez's same smuggling method and facilities to ship cocaine to the mainland United States; and the government's references to other drug traffickers separately working to supply Rodríguez with cocaine for his smuggling operation. But Camacho does not argue, nor does the record show, that the government's evidence purported or even attempted to show that Camacho was a participant in any of these other conspiracies. Simply put, the government did not adduce evidence tending to show that Camacho was involved in any conspiracy but the one alleged in the indictment.

Adding belt to suspenders, we note that the district court told the jury that it needed to find beyond a reasonable doubt "that the agreement specified in the Indictment, and not some other agreement or agreements, existed between at least two people . . . to possess with intent to distribute cocaine." We have found virtually identical instructions sufficient in similar cases in which a defendant challenged a district court's refusal to give a multiple conspiracy instruction. See United States v. Niemi, 579 F.3d 123, 126-27 (1st Cir. 2009); United States v. Balthazard, 360 F.3d 309, 315-16 (1st Cir. 2004). And while more might be said on the matter by a judge in a case posing a greater risk of confusion, see, e.g., United States v. Trainor, 477 F.3d 24, 34 & n.20 (1st Cir. 2007), this was not such a case.

The foregoing discussion also removes the heart from Camacho's insufficiency argument, which rests on the assertion that there was no evidence of the single conspiracy charged. Here, the indictment, the evidence, the instructions, and the verdict all aligned: at Rodríguez's request, Camacho secured a supply for the smuggling pipeline and otherwise knowingly assisted in using the pipeline to convert cocaine into dollars by shipping it from Puerto Rico for sale in the mainland United States.

**B.  Hearsay**

Camacho's hearsay argument trains on the trial court's admission of the testimony by Torres and Sierra relating what Rodríguez told them about Camacho's role in the conspiracy. Camacho's principal argument challenging the admission of that testimony relies on his claim that he was not a member of Rodríguez's conspiracy, thus Rodríguez's out-of-court statements were not admissible against him. This argument fails in the wake of our determination that the evidence amply supported a finding that the two were in the conspiracy together.

That leaves Camacho with a second, more technical argument. He points out that when affirming a tentative decision to admit the challenged testimony subject to proof of the conspiracy, and in listing the names of the conspirators, the district court neglected to mention the undisputed leader, Rodríguez, by name. Having read the district court's comments, we

think it fairly plain that the court was including the leader of the conspiracy even though the court did not mention him by name. Guided by the initial objections, none of which challenged Rodríguez's role as a leader of the conspiracy, the court appears to have been concerned not with listing every person who, by a preponderance of the evidence, appeared to be a member of the conspiracy, but rather, with listing the testifying witnesses capable of relaying the statements of their named-defendant coconspirators. In any event (and likely because Rodríguez's inclusion was obvious), Camacho did not object or in any way point out the exclusion when it was clear that the court would have readily confirmed our reading of its statement if asked. The objection is therefore forfeited (if not waived) and our foregoing discussion of the conspiracy evidence negates any possibility of finding plain error.

## C.   Jury Contamination

Camacho trains his final two arguments on the district court's handling of two procedural issues separate and distinct from the issues of proof discussed above.

A week into Camacho's trial, Juror Number 23 advised the U.S. Marshal assigned to the jury that Camacho's stepson had approached her at her place of business. The Marshal informed the court, which conducted voir dire of the juror in the presence of the parties and outside the presence of the other jurors.

Questioning revealed that Camacho's stepson had approached Juror Number 23 to tell her that the case against Camacho was "fabricated" and Camacho was "a good person." Juror Number 23 also indicated that she had not spoken to any other jurors about the incident. The government argued for Juror Number 23's dismissal; Camacho and his codefendants argued against it. The district court sided with the government, excusing Juror Number 23--in the presence of the rest of the jury--because of the "situation" in which she had been "involved" and advising her to "not contact any of the jurors about this case or what happened or anything having to do with this case." Juror Number 23 agreed and departed. No party lodged any objection to the court's instructions to Juror Number 23.

A few weeks later, a second, unrelated incident occurred involving prosecution witness Juan Delgado-Biaggi ("Delgado"), a former American Airlines crew chief who had participated in the drug smuggling operation. Delgado advised a court security officer that he recognized Juror Number 60. The officer informed the court and a recess was called. After questioning Delgado outside the presence of the jury, the court questioned Juror Number 60 outside the presence of the other jurors (and Delgado). Juror Number 60 told the court that he had seen Delgado working as an American Airlines employee. He also informed the court that he had mentioned as much to another juror, Juror Number 8, during

Delgado's testimony. Juror Number 60 told the court that he had not made any other comments to any other members of the jury.

Shortly thereafter, the court questioned Juror Number 8. Juror Number 8 stated that she did not know whether or not Juror Number 60 said anything to her about Delgado, explaining, "I know I heard that he told me that one of them he kind of seen him-- like, he recognizes as he saw him, but he didn't make it for sure. He didn't say for sure, as far as I know." She said that she "didn't talk to anybody about it" and that it would "[n]ot at all" affect her impartiality. The court denied the defendants' request for complete voir dire of the entire jury and denied the defendants' subsequent motion for a mistrial. The court then excused Juror Number 60 and instructed him to have no further contact with the other jurors. It did not excuse Juror Number 8, but it did instruct her to refrain from discussing the incident.

On appeal, Camacho argues that the district court abused its discretion when it refused to conduct full voir dire to ensure that no other jurors were affected by either incident.[2] As to the

_____

[2] Camacho appears also to argue that by obliquely referring to Juror Number 23's "situation" in the presence of the other jurors, the district court created some measure of mistrust or bias against the defendants. Camacho did not raise this issue below, so we review for plain error. See United States v. DeLeon, 187 F.3d 60, 67 (1st Cir. 1999). We do not see how the court's vague, euphemistic reference to Juror Number 23's run-in with Camacho's stepson could have engendered in the minds of the remaining jurors anything more than curiosity. The district court did not plainly err.

first incident (involving Juror Number 23), we find that Camacho has waived any argument challenging the trial court's failure to question the entire jury. When the government sought Juror Number 23's removal because of her contact with a person friendly to the defense, Camacho objected, arguing that the juror testified that she could remain impartial and did not feel threatened. Having affirmatively made such an argument below, Camacho cannot now argue on appeal that it was plain error for the court not to investigate further whether other jurors may have been contaminated by Juror Number 23 to Camacho's prejudice. See United States v. Gaffney-Kessell, 772 F.3d 97, 100 (1st Cir. 2014) (observing that waiver occurs where a party's actions "ring not of oversight, inadvertence, or neglect in asserting a potential right, but rather of a deliberate course of conduct" (citation omitted)).

As to the second incident, Camacho joined his codefendants in arguing for full voir dire and objecting to the court's decision to retain Juror Number 8, so we review the court's decision for abuse of discretion. See United States v. Morosco, 822 F.3d 1, 13 (1st Cir. 2016). In response to a nonfrivolous claim that a jury might be biased or contaminated, a district court is required to inquire into whether contamination occurred and, if so, whether such contamination was prejudicial. See United States v. Zimny, 846 F.3d 458, 464 (1st Cir. 2017); United States v.

- 15 -

Bristol-Mártir, 570 F.3d 29, 42 (1st Cir. 2009). "[T]he trial court has wide discretion to fashion an appropriate procedure for assessing whether the jury has been exposed to substantively damaging information, and if so, whether cognizable prejudice is an inevitable and ineradicable concomitant of that exposure." United States v. Bradshaw, 281 F.3d 278, 290 (1st Cir. 2002). We will defer to a trial court's finding that the jury was not contaminated "[s]o long as the district judge erects, and employs, a suitable framework for investigating the allegation and gauging its effects, and thereafter spells out his findings with adequate specificity to permit informed appellate review." United States v. Boylan, 898 F.2d 230, 258 (1st Cir. 1990).

Camacho argues that the district court abused its discretion because it did not do enough to ascertain whether Juror Number 60's recognition of a witness and the juror's act of disclosing such recognition to one of his fellow jurors led to contamination. As an initial matter, we find the claim of bias or contamination tenuous at best. After all, the witness's employment was not a matter of dispute, and Juror Number 60 merely reported that he had seen the witness before and knew the witness worked for American Airlines. While the cautious judge with an available alternate did not abuse his discretion in excusing Juror Number 60, that decision did not turn Juror Number 60 into a Typhoid Mary of bias warranting any extraordinary effort to root out all

- 16 -

contamination. In any event, the district court took adequate steps to ensure that Juror Number 60's comments to Juror Number 8 had no effect on Juror Number 8's ability to decide the case impartially and that those comments were not shared with any other members of the jury. On this record, the district court was entitled to deem the jurors' explanations credible. We, in turn, have no reason not to believe that both jurors followed the court's instructions. See United States v. Pagán-Ferrer, 736 F.3d 573, 587–88 (1st Cir. 2013); see also Correia v. Fitzgerald, 354 F.3d 47, 52 (1st Cir. 2003) ("Assuming that venirepersons pass through this screen [of voir dire], the trial court may operate on the presumption that the chosen jurors will obey the judge's instructions to put extraneous matters aside and decide each case on its merits."). The district court did not abuse its discretion.

**D. Testimony Read-Back**

Camacho's final challenge concerns the district court's handling of the jury's request to hear certain testimony read back after the jury began deliberations. During deliberations, the jury sent a note to the court asking to hear Torres's testimony again. The parties agreed that the court would read back Torres's entire testimony, including both direct and cross examination. The jury returned to the courtroom and the courtroom deputy read Torres's direct examination, including a portion of the examination in which Torres explained that he had traveled with

Camacho from New Jersey to Puerto Rico.  When the court finished reading Torres's direct testimony, the jury sent a note to the court stating:  "[W]e do not need to hear the contra-interrogatory. Thank you for your support.  Respectfully."  The court without objection polled the jury, and every one of the jurors confirmed that they did not want to hear cross-examination again.  The court thus allowed the jury to resume deliberations without hearing Torres's cross-examination anew.  The court shortly thereafter admonished the jury not to place additional weight on Torres's direct testimony just because they did not rehear the cross.

Camacho argues on appeal that the court committed reversible error by reading back Torres's direct testimony without reading back his testimony on cross-examination.  Camacho contends that the court's choice to permit the jury to return to the jury room without rehearing Torres's complete testimony kept the jury from hearing Torres state that, contrary to his direct testimony that he and Camacho returned to Puerto Rico from a trip to New Jersey they took together, he in fact flew back from Philadelphia while Camacho flew back from New Jersey.  As Camacho sees it, Torres effectively recanted his direct testimony on cross. Camacho argues that Torres's contradictory testimony undermined the government's proof and demonstrated Torres's lack of credibility. According to Camacho, allowing Torres's direct testimony to be heard without his cross-examination functionally rehabilitated

Torres as a witness and reasserted his faulty testimony. Camacho did not object at the time this alleged error occurred, so we review for plain error. See United States v. Flores-Rivera, 787 F.3d 1, 30 (1st Cir. 2015).

The district court did not plainly err. For one thing, "our circuit has yet to establish any bright-line rules on read-back procedures." Id. The district court thus could not have plainly erred because a plain error is one that is clear and obvious, and "an error will not be clear or obvious where the challenged issue of law is unsettled." United States v. Goodhue, 486 F.3d 52, 57 (1st Cir. 2007). We need keep in mind, too, a jury's practical ability to decide what evidence to focus on during its deliberations. Jurors might discuss part of a witness's testimony, or part of a document. One simply does not normally know when this happens. The fact that in this instance we happen to know that the jury was interested in rehearing only Torres's direct testimony provides no reason to force-feed the jury a read-back that it expressly deemed unnecessary. In short, the court likely made no error, much less plain error, in declining to require the jury during deliberations to rehear testimony that it specifically stated it had no need to rehear.

### III.  Conclusion

Finding the evidence sufficient to support the jury's verdict and observing no other reversible errors in the record below, we affirm.